This was a bill filed by the plaintiff against the administrator of his guardian, seeking an account and settlement of the guardianship, which was answered by the defendant, and replication made and proofs taken, and being set down for hearing, was transmitted to this Court by consent. In this Court, at June Term, 1855, it was decreed that the plaintiff was entitled to an account, and it was referred to the clerk to take an account, and having made his report at the last term of this Court, *Page 116 
exceptions to the same were filed by the plaintiff, and now the cause is again heard upon the exceptions. The whole case is presented in the opinion of the Court.
There are many peculiar circumstances which distinguish this case from any of the kind that has ever fallen within the observation of either member of the Court. During a period of five years the guardian makes no sort of return, and there is nothing among the papers of the Clerk's office to charge him with one cent. A few days after the ward arrives at age the guardian goes to him in the country and professes to come to a settlement in the presence of the ward's mother and a brother-in-law of the guardian. No memorandum is made of the settlement and the larger part of the supposed balance is paid off by handing to the ward notes upon two men, both notoriously insolvent, and thereupon the ward is induced to execute a formal realize under seal.
For the last three years of his minority the ward is permitted to become the hirer of the slaves and the renter of the land, and to go on and trade and manage the business as if he was of full age.
Besides pretending to manage the business the ward gets married, and upon arriving at full age had a wife and two children on his hands. With an ample estate the ward is not sent to school or, at all events, when he arrives at age he is not able to read or to write, and makes his mark to the release given to the guardian. The day after he arrives at age the ward is under the necessity of executing a deed of trust, whereby he conveys his entire estate for the satisfaction of creditors. Thus, at the age of twenty-one, he is thrown upon the world, unable to read or write, with a wife and two children, and without one cent of a large patrimonial estate.
These, truly, are unfortunate results, and every one will say, in this instance, the benign purpose of the law in requiring guardians to be appointed has failed of its object. In the absence of all explanation, we are forced to the conclusion that the guardian has been guilty of gross neglect, and the question is: to what extent is it in our power to hold him accountable for such utter disregard of his duty?
The Clerk, in his report, says: "No vouchers for expenditures (169) are produced. No returns were made. No commissions are allowed the guardian." The defendant does not except. Our attention is consequently confined to the three exceptions of the plaintiff, and reference is made to this part of the report, as it was to the *Page 117 
"unfortunate results" set out above, merely to give a general outline of the case, from which it abundantly appears that the defendant, like all trustees, guardians and agents who are guilty of gross neglect, must submit to have every inference made against him.
1. No charge is made against the guardian for the profits of the estate for the last three years. The Clerk gives as his reason for not making a charge the fact that "the plaintiff rented the land and hired the negroes for three years, and at the settlement received his notes therefor as part payment of the balance due him." This reason is not a sufficient one, and if the question stood upon it alone the exceptions would be sustained.
Suppose a guardian allows the ward to take the management of the estate, and the land and negroes yield nothing, can it be that the fact of the ward's being allowed to control the business operates to relieve the guardian from his liability to account for such rents and hires as the property should have been made to produce? The very purpose for having a guardian is because the infant is supposed not to have sufficient discretion to manage the property himself, and to allow a guardian to discharge himself in this way will defeat the whole purpose of the law and enable a guardian to take advantage of his own wrong and protect himself because he has been guilty of a gross neglect of trust confided to him. Nor is the case altered by putting up the property to be rented and hired at public vendue and going through the form of taking the ward's notes, for, of course, when it is known to be the pleasure of the guardian and ward that the latter shall have the property, no one will bid against him, so the amount of it will be that the guardian escapes his liability to account for the full value that the property ought to be made to yield, and the ward is to take the chances (170) of being able to manage his estate successfully.
But there is another fact shown by the proofs: the mother of the plaintiff became his surety upon the several notes given by him for the rents and hires; these notes were handed to him and he is not now able toproduce them, consequently he is not in a situation to avail himself of this exception, and it must be overruled, for the defendant cannot be charged with these items unless he can have the benefit of the notes executed by the plaintiff's mother out of which to seek indemnity, so far as they would reach, towards the real value of the rents and hires.
2. The Clerk allows the guardian $500 as expenditures. The estimate is based upon the deposition of Mr. Kenan. If this was all that the ward was allowed to expend in five years it would certainly be reasonable enough, but for the last three years he was allowed to expend all that he could make out of the property and all he could get credit for, and the result was such as we have seen. Without going more at large into the *Page 118 
subject, it is sufficient to say the guardian has filed no account showing the items of expenditure, and without doing so, a guardian can never entitle himself to a credit. It is his duty to provide for the maintenance and education of his ward, and for this purpose he can make all necessary outlays, keeping within the ward's income. But when he comes to claim credit for an expenditure he must, as of course, show the items, so that it may appear that the expenditures were proper. No account whatever is filed in this case. Mr. Kenan simply says that the guardian paid him between $400 and $500, he thinks the latter sum, during the time he was guardian, by way of the ward's expenditures. How does it appear that these expenditures were for education or maintenance, or any other proper purpose? It may have been for horses, or guns, (171) or spirituous liquor, and most probably was, in a great measure, for the expenses of the plantation while under the ward's management. This exception is sustained upon the ground that there is no account showing the items of expenditure.
3. The Clerk credits the guardian with the notes of Blackman Eves, on the ground that the insolvency of the firm appears to have been entirely unexpected to the community; took place in 1843, and was so sudden that the first announcement of it seems to have been not until an assignment of their whole effects was made, and so he concluded the guardian was guilty of no negligence, and the loss should fall on the ward.
The statute makes it the duty of guardians to "lend out the money of wards upon bond or note with good and sufficient security," etc., and requires them, "if the person or persons to whom such money shall be lent, or their securities, are likely to become insolvent, to use all lawful means to collect the money, on pain of being liable for the same." Of course, if a guardian has complied with the statute, and taken bond with good and sufficient security, and the borrower and his securities fail so suddenly that the money cannot be saved by the use of proper diligence, the loss must fall upon the ward; but to entitle the guardian to the benefit of this rule, it is incumbent on him to show that he has complied with the requisition of the statute by taking a bond or note with good and sufficient security; and the question is, did the guardian, in this instance, do so? We concur with the counsel of the defendant that the security meant is personal security, and that a guardian is not, by our law, as he is by the law of England, required to invest the funds of his ward upon real or government securities. So, if he takes good and sufficient personal security he has complied with our statute; but he must take security of some kind. Suppose a guardian lends the money of his ward to a person who has property in possession to the value, say of $100,000, and is not at all embarrassed nor engaged in any business of a *Page 119 
hazardous nature, and it should so happen that the borrower (172) suddenly fails, the loss will undoubtedly fall upon the guardian; for, although he took a good note, yet he neglected to take good and sufficient
security, and has not complied with the letter or the spirit of the statute, the policy of which is to require the investment to be secured by the bond or note of some person in addition to the borrower.
Or suppose a guardian lends the money of his ward to a firm, consisting of two persons, who are engaged in merchandise, and who are solvent and in good credit at the time the money is lent, and it is turns out that they afterwards fail suddenly, the loss will undoubtedly fall upon the guardian, because he neglected to take good and sufficient security, and in effect, took only the note of the borrower. And if it be said, as the firm consisted of two individuals, the note had in fact the names of two persons, the reply is the two made in truth but one; for whatever breaks one will break both. So there is no security but the name of the borrower. This is not as strong a case as the one first put, owing to the nature of the business in which the firm was engaged.
In our case it appears from the proofs that the firm of "Blackman 
Eves" owned a large property, had a very extended credit, and was engaged in large operations — farming, making turpentine, buying turpentine and pork on speculation — and the business of the two was so connected that if one failed the other was obliged to fail also, as was shown by the general assignment of all their effects, and their total insolvency. So the guardian had, in fact, only the note of the borrower, and neglected to take the security which he was required by law to do. Admit that, owing to the high credit of Blackman Eves, some prudent men would have taken their note without requiring security, for the purpose of effecting a large sale of turpentine or pork at the top of the market. That is a very different operation from lending money, which can always be readily effected, although the borrower is required to (173) give good security.
This exception is sustained on the ground that when a guardian lends money to a firm it is his duty to take some other security besides the names of the members of the firm.
The report must be reformed according to this opinion.
PER CURIAM. Decree accordingly.
Cited: Williamson v. Williams, 59 N.C. 65; Hurdle v. Leith, 63 N.C. 600;Camp v. Smith, 68 N.C. 541; Collins v. Gooch, 97 N.C. 190; Watsonv. Holton, 115 N.C. 37.
Dist.: Whitford v. Foy, 65 N.C. 268. *Page 120